UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRISTIAN MASEK,                          )
                                          )
        Plaintiff,                        )
                                          )      No. 08 C 1277
        v.                                )
                                          )      Magistrate Judge Cole
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
        Defendant.                        )

## MEMORANDUM OPINION AND ORDER

The plaintiff, Christian Masek, seeks review of the final decision of the Commissioner

("Commissioner") of the Social Security Administration ("Agency") denying his application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42

U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42

U.S.C. § 1382c(a)(3)(A). Mr. Masek asks the court to reverse the Commissioner's decision and

award benefits, or remand the decision for further proceedings. The Commissioner seeks an

order affirming the decision.

### I.
### PROCEDURAL HISTORY

Mr. Masek applied for DIB and SSI on November 3, 2004, alleging that he had been

disabled since October 15, 2004, due to major depressive disorder. (Administrative Record

("R.") 28, 92). His application was denied initially and upon reconsideration. (R. 43-46). Mr.

Masek continued pursuit of his claim by filing a timely request for rehearing on August 22,

2005. (R. 84).

An administrative law judge ("ALJ") convened a hearing on May 3, 2007, at which Mr.

Masek, represented by counsel, appeared and testified. (R. 254-78). In addition, Dr. Ellen

Rosenfeld testified as a medical expert ("ME"), and Susan Ettinberg testified as a vocational

expert ("VE"). (R. 278-335). On June 22, 2007, the ALJ issued a decision finding Mr. Masek not disabled. (R. 28-42). The ALJ determined that, with no exertional limitations, Mr. Masek could perform simple routine tasks without a production rate pace that may include occasional interaction with the general public, supervisors, and coworkers, and may include occasional changes in work setting. (R. 37). This became the final decision of the Commissioner when the Appeals Council denied Mr. Masek's request for review of the decision on January 15, 2008. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Masek has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Masek was born on October 31, 1975, making him thirty-one years old at the time of the ALJ's decision. (R. 43). He earned a four-year standard high school diploma on June 9, 1994, at age nineteen, ranking 194 out of 343 in the 43rd percentile with a GPA of 2.7. (R. 206). In middle school, Mr. Masek was placed in an "exceptional student program" as a result of being evaluated as "specific learning disabled" and "speech impaired" on April 15, 1988 and October 20, 1987 respectively. (R. 212). The transcript shows a "dismissal date" of April 10, 1989 listed on the same line as the speech impairment classification. (R. 212). His high school transcripts do not show enrollment in any learning disabled classes. (R. 206-12).

Between 2000 and 2004, Mr. Masek worked in a variety of positions including forklift operator, dishwasher, bottle labeler, fast-food restaurant worker, and retail clerk. (R. 266-69). Mr. Masek testified that his jobs often ended either because he quit or because he stopped going

to work due to depression or because he "couldn't handle the people." (R. 267, 269). His disability report shows that he was "laid off" in 2004. (R. 92). Following termination, Mr. Masek was advised not to seek employment during the pendency of his Social Security Disability case. (R. 40, 282-83).

## B.
## Medical Evidence

Mr. Masek reported feeling depressed since the age of six and suicidal since the age of nineteen. (R. 156, 184). Although his parents subjected him to some emotional abuse, he traces the predominate source of his trauma to a fecal incontinence problem which went uncorrected until middle school. (R. 156, 264). Fellow students often picked on him as a result, leading to low self-esteem, social isolation, and violent physical outbursts. (R. 156, 184, 264).

Mr. Masek has a history of using alcohol, cocaine, and marijuana beginning at the age of eighteen. (R. 128, 141, 143, 152, 156, 166, 185). However, he was drug free at the time of his hearing with the ALJ. (R. 156, 185). He reports occasionally hearing voices saying derogatory things about him and telling him to kill himself, although he has no history of paranoid ideation or psychotic episodes. (R. 186). He has used an Albuterol inhaler for asthma, but testified that he was not using any asthma medication at the time of his hearing. (R. 30-31, 128-29, 255).

Mr. Masek reported making twelve suicide attempts during his lifetime, yet the record contains no independent medical evidence to corroborate his testimony. (R. 184). His one documented suicide attempt occurred on August 14, 2004, when he overdosed on over-the-counter pills and alcohol, and considered setting his car on fire. (R. 31, 156, 184). Following the attempt, he was admitted to St. Joseph Hospital. (R. 31, 156). Shortly after admission, he was transferred to Tinley Park Mental Health Center and then to Madden Mental Health Center ("Madden") where he remained from August 19 – October 12, 2004. (R. 31, 156). Mr. Masek

reported that this was his seventh psychiatric hospitalization since the age of nineteen, but once again there is no independent evidence to support this claim. (R. 185).

At Madden, nurses monitored Mr. Masek closely and recorded their observations in progress notes multiple times each day. (R. 136-40, 149-50, 180-82). Dr. Shabbir Zarif, a psychiatrist, also saw Mr. Masek three times per week. (R. 128). Dr. Zarif reported Mr. Masek's condition on admission as alert and cooperative with fair hygiene. (R. 156). He described Mr. Masek as having a low key mood, sad and mildly reactive, and rated Mr. Masek's depression at 7/10 as opposed to the 9-10/10 rating at the time of Mr. Masek's suicide attempt. (R. 156). At the time of admission, Dr. Zarif also evaluated Mr. Masek to have a "mild" degree of functional limitation in activities for daily living, an "extreme" degree of limitation in social functioning, and a "marked" degree of limitation in "concentration, persistence, and pace." (R. 131). Mr. Masek had no suicidal or homicidal ideation at admission and no overt psychosis. (R. 156). His insight, judgment, and concentration were fair to poor. (R. 156).

Mr. Masek reported periods of doing well following his last hospitalization in 2000, especially when he had a job and a place to stay. (R. 156). Since that hospitalization, however, Mr. Masek received very little outpatient treatment and experienced depression, anxiety, and poor coping skills when stressors began to increase. (R. 156). Prior to his 2004 hospitalization, Mr. Masek felt overwhelmed because he was living out of his car and had the sense that a job prospect was not going to turn out. (R. 156).

At intake, Dr. Zarif started Mr. Masek on 20 mg of Paxil since Mr. Masek was not sure what had worked for him in the past. (R. 156). Dr. Zarif gradually increased the dosage to 60 mg, and added Trazodone to the regimen to alleviate Mr. Masek's sleeping difficulties. (R. 156). During his stay, Mr. Masek interacted adequately in low anxiety and low stress situations,

but felt overwhelmed and anxious when difficult situations arose. (R. 156). At one point, Mr. Masek became agitated and tried to attack another patient for making fun of him. (R. 156). When Dr. Zarif later discussed the incident with Mr. Masek during a therapy session, Mr. Masek became very tearful and depressed when relating the incident to his past experiences. (R. 156). Overall, Mr. Masek liked the structure and safety of the hospital and felt uncomfortable with the idea of discharge into an unknown situation. (R. 156).

In time, Mr. Masek learned how to process his uncertainty, and his depression improved considerably. (R. 157). He was able to handle escort passes and unescorted rehabilitation passes very well, and he participated well in the milieu. (R. 157). On October 12, 2004, Mr. Masek was discharged since he had achieved the maximum benefit from the hospital stay. (R. 157). Upon discharge, Dr. Zarif diagnosed Mr. Masek with major depression, dysthymia, alcohol and marijuana abuse in partial remission, and history of learning disorder. (R. 157). Mr. Masek's mood on discharge was mostly euthymic, reactive, and appropriate, though at times he became somewhat anxious. (R. 157). At the time of discharge, Dr. Zarif evaluated Mr. Masek to have good insight and judgment, and fair concentration. (R. 157). He noted that Mr. Masek did well with structure, support, and encouragement, and stated that Mr. Masek's ongoing well-being depended on him "gaining self esteem through supportive employment, sobriety and constant encouragement to self empowerment." (R. 157). On discharge, Mr. Masek was referred to a group home due to his homelessness. (R. 32, 228). He was also referred to Metropolitan Family Services ("MFS") Adult Mental Health Program at South Chicago Center for continuing psychiatric treatment. (R. 32, 228).

Mr. Masek began services at MFS on October 13, 2004 for the treatment of major depressive disorder, recurrent. (R. 32, 228-30). He met with Dr. Thodur Ranganathan

approximately every four weeks between October 26, 2004 and March 7, 2007 for psychiatric follow-up and medication management. (R. 12, 32, 228, 232). At the intake appointment, Dr. Ranganathan wrote that Mr. Masek denied any suicidal or homicidal thoughts; his current medications were helping (he had previously been on Zoloft), and he was sleeping well. (R. 246). His affect was restricted with increased intensity; he evidenced feelings of despondency but had fair insight and no evidence of mania. (R. 32, 246-47). Since Mr. Masek had been laid off, he was isolating himself and procrastinating. (R. 246). He had friends for support but stayed home a lot and spent time with books, movies, and video games. (R. 32, 247).

On August 22, 2005, Dr. Ranganathan wrote a Mental Disorders Report to assess the impact that Mr. Masek's symptoms would have on his ability to function in a work setting. (R. 224-27). Dr. Ranganathan wrote that Mr. Masek's symptoms had lasted or could be expected to last at least twelve months. (R. 224). He diagnosed Mr. Masek with major depressive disorder recurrent and history of substance abuse. (R. 224). When asked whether there were certain situations that triggered Mr. Masek's symptoms, Dr. Ranganathan wrote a slash through all of the listed situations and noted that Mr. Masek's illness did not restrict his daily activities. (R. 224). He wrote that when depressed, Mr. Masek still had problems with concentration and also procrastinated. (R. 225). He noted that Mr. Masek was not living in a highly supportive and protective setting in order to attenuate severe symptoms. (R. 225). Instead, Mr. Masek lived in a group home that was not highly structured. (R. 225). Dr. Ranganathan did not answer the question about whether Mr. Masek was able to function in a competitive work setting on an eight-hour per day, five days per week basis, stating that an answer to this question was beyond the scope of his interaction with the patient. (R. 225). He wrote that Mr. Masek was responding

well to the current regimen; his prognosis was good provided that he maintained compliance with treatment and refrained from substance abuse. (R. 225).

Dr. Ranganathan did not check off the minimum number of symptoms or functional limitations required for a finding of Affective Disorder in the Listing of Impairments. (R. 226; 20 C.F.R. Pt. 404, Subpt. P, App. 1). He marked that Mr. Masek had depressive syndrome manifested by anhedonia, decreased energy, and difficulty in concentration or thinking. (R. 226). In order for a finding of depressive syndrome, which is in turn sufficient for a finding of Affective Disorder, Dr. Ranganathan would have had to check off a fourth symptom. (R. 226). Dr. Ranganathan also checked that Mr. Masek had experienced marked difficulties in maintaining concentration, persistence, and pace, and also that he had experienced repeated episodes of decompensation, each of extended duration. (R. 226). Dr. Ranganathan would have had to check off at least one more functional limitation for a finding of Affective Disorder. (R. 226).

Dr. Ranganathan completed a second Mental Disorders Report on November 8, 2006, which differed from the first in a number of respects. (R. 248-50). First, Dr. Ranganathan wrote that "sometimes" Mr. Masek's symptoms could be triggered by encounters with groups of people; coping with supervisors, coworkers, or the public; and travel or leaving the home environment. (R. 248). He wrote "yes" by the line stating that Mr. Masek's symptoms were triggered by stress caused by things like having time and productivity demands. (R. 248). Second, Dr. Ranganathan noted that Mr. Masek's illness now restricted his daily activities. (R. 248). He elaborated by writing "problems functioning, necessary to leave the room or situation, isolating" and "sometimes trouble thinking – 'mind goes blank.'" (R. 248-49). Third, Dr. Ranganathan changed his assessment in stating that Mr. Masek did live in a highly supportive

and protective setting in order to overcome severe symptoms, even though Mr. Masek's living situation had not changed. (R. 249). He wrote that outside such a setting, Mr. Masek would have problems with follow-through on tasks, and increased suicidal thoughts would be prevalent without support. (R. 249). Lastly, Dr. Ranganathan thought that Mr. Masek could not function in a competitive work setting. (R. 249). He also wrote that Mr. Masek's response to treatment had been fairly positive but the prognosis was guarded. (R. 249).

In the second report, Dr. Ranganathan also increased the number of checkmarks required for a finding of Affective Disorder in the Listing of Impairments. (R. 226; 20 C.F.R. Pt. 404, Subpt. P, App. 1). This time, Dr. Ranganathan noted that Mr. Masek had exhibited psychomotor retardation and sleep disturbance, but no longer exhibited anhedonia. (R. 250). He also added that Mr. Masek had a residual disease process resulting in marginal adjustment that even a small increase in mental demands or change in environment would be predicted to cause decompensation. (R. 250).

Exhibit 11F contains twelve pages of treatment notes, in addition to a medication log, representing twenty-one visits to Dr. Ranganathan and Mr. Masek's therapist between October 26, 2004 and March 7, 2007. (R. 32, 232-47). In all of the entries, Mr. Masek was assessed as stable. (R. 232, 235-36, 238-44). Mr. Masek's mood was alternately assessed as "a little bit down," "okay," or "better." (R. 232, 235-36, 238-44). Mr. Masek seemed to become increasingly depressed and would miss appointments when he was not on medication. (R. 238, 240-42). Mr. Masek never reported any suicidal or homicidal thoughts. (R. 232, 235-36, 238-44).

The notes specifically include the following information. On December 18, 2004, Mr. Masek was doing okay; the medication was helping him and he was assessed as stable. (R. 244).

8

The December 13, 2005 visit noted that Mr. Masek had been picked up on an old warrant, missing two appointments; he restarted medications; he said he had been okay and had no side effects from medications; he was assessed as stable. (R. 32, 241). On January 25, 2005, Mr. Masek was doing okay and was stable. (R. 244). On February 22, 2005, Mr. Masek was sick; he reported sleeping okay and reading and playing games; assessed as stable. (R. 243). On March 22, 2005, Mr. Masek reported that he had a good time with a friend; he was assessed as stable with no suicidal thoughts. (R. 243). On May 13, 2005, Mr. Masek was a bit down but stable. (R. 242). On September 9, 2005, Mr. Masek missed an appointment; he had been out of medication for two weeks and noticed the difference; once on medication he did better and was still assessed as stable. (R. 242). On January 1, 2006, Mr. Masek was okay and assessed as stable. (R. 241). On March 17, 2006, Mr. Masek was feeling better; he had a friend who picked up X-Box 360 and they were having a blast together; he was sleeping well and assessed as stable. (R. 239).

On March 22, 2006, Mr. Masek had been without medication for four weeks and had some problems where he would stay in bed a lot; he was started on Lexapro, which he reported helped a lot when he was seen on April 19, 2006. (R. 32, 240). On June 14, 2006, Masek was playing video games and doing well. (R. 239). On August 9, 2006, Mr. Masek felt a little down. (R. 239). On October 11, 2006, Dr. Ranganathan noted that Mr. Masek had missed his last appointment without calling; he had no medication; he had no active plans and did not want to go to a hospital; he was assessed as stable. (R. 238). On October 21, 2006, Mr. Masek was feeling better, had no suicidal ideas, was watching movies and attending drop-ins; assessed as stable. (R. 238). On November 15, 2006, Mr. Masek was doing better, was becoming more involved in activities, attended drop-in sessions, played video games, had no suicidal ideas;

9

assessed as stable. (R. 236). On November 25, 2006, Mr. Masek was feeling a little better, was not suicidal, was watching movies, was calm and was attending drop-in sessions; assessed as stable. (R. 32). On February 7, 2007, Mr. Masek said he was a little down; he was to continue his medications; assessed as stable. (R. 32, 232). On March 7, 2007, Mr. Masek said he was okay; he was playing video games, was not suicidal, and had no side effects from medication; assessed as stable. (R. 33, 232).

The director of Mr. Masek's group home (Beekon House) for 2 ½ years wrote in an undated note that Mr. Masek suffered from depression; he isolated himself, sleeping day and night for days. (R. 33, 251). He did now shower or eat well. (R. 33, 251). To the director's knowledge he had never used drugs or alcohol, nonuse being a condition of residency, and he was supposed to take all prescribed medication. (R. 33, 251). But as the comments are undated, there is no way to tell exactly what period they pertain to.

Allen D. Nelson, M.D., saw Mr. Masek for a psychiatric evaluation on behalf of the Bureau of Disability Determination Services on February 7, 2005. (R. 33, 184). Mr. Masek came to the exam alone by public transportation and found the office without difficulty. (R. 33, 184). Mr. Masek understood the reason for the interview and was generally cooperative although significantly depressed, withdrawn and preoccupied. (R. 33, 184). A majority of Dr. Nelson's report contains much of the same self-reported information Mr. Masek had provided to Doctors Zarif and Ranganathan including: depression since the age of six, bowel problems, twelve suicide attempts, seven psychiatric hospitalizations, and a history of drug abuse. (R. 184-85).

Dr. Nelson recorded that Mr. Masek experienced: persistent feelings of low self-esteem, a low frustration tolerance leading to anger and occasional violent outbursts, chronic insomnia,

frequent suicidal ideation, and significant social withdrawal. (R. 33, 184-85). In terms of daily living, Dr. Nelson noted that Mr. Masek: stays in most days, does his own shopping, makes his own meals, has no hobbies, and can manage his own funds. (R. 34, 185-86). Mr. Masek lives with a roommate in a residential facility, has one friend, and no family contact. (R. 34, 185). He takes Trazodone and Paxil. (R. 34, 185). On the mental status exam Dr. Nelson wrote: reasonably friendly with no abnormalities of gait or movement; speech normal; no formal thought disorder and definitely not psychotic; no memory impairment or deficits in abstract functioning; no gross defects in reality testing; moderate impairment in judgment due to depressed, pessimistic view of self and life situation. (R. 34, 185-86). Dr. Nelson diagnosed Mr. Masek with bipolar disorder, depressed type, and history of marijuana abuse in remission for four years. (R. 34, 186). His overall prognosis was psychiatrically guarded. (R. 34, 186).

## C.
## Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

Mr. Masek graduated from Pinellas Park High School in Largo, Florida. (R. 260). He was picked on in high school because up until middle school he had trouble controlling his bowels due to weak muscles. (R. 264). He was in learning disabled classes from the sixth grade through high school. (R. 260, 263). In high school he was in a regular class for math, but a learning disabled class for reading and spelling. (264-65). The difference between learning disabled classes and regular classes was that the class size was smaller (about 8-10 students instead of 20), and they used audio-visual learning methods more often. (R. 260). He is able to read, and identified that his handwriting appeared in Exhibits 6E and 7E. (R. 265-66).

Mr. Masek held a variety of jobs. (R. 266-69). He operated a forklift truck for more than a few months, but stopped going to work one day because of his depression. (R. 266-67). His employers helped him get a doctor and he returned to work one week or one month later. (R. 267). Upon return, he was moved from working on the forklift into an office. (R. 267). After about one month in the office, he became depressed again and did not go to work. (R. 267). Mr. Masek also worked as a dishwasher for about one week, labeled alcohol bottles with a state ticket for refunds, worked at a plastic molding plant, performed stock-type work as a retail clerk at a place called Poolerama, and worked for Wendy's. (R. 267-69). After he was offered a management position at Wendy's, he quit because things weren't going well and "he was going under business anyways." (R. 268).

Mr. Masek was incarcerated multiple times. (R. 270). Once for breaking into Poolerama, where he sometimes slept. (R. 270). He broke open all the cash registers but didn't know why, except that he felt like he was probably going to kill himself afterwards. (R. 270). He had also been incarcerated for buying alcohol for minors and fleeing from the police due to suspended auto registration. (R. 270). Oddly, he claimed that during pursuit, he had tried to kill himself "somewhat" because he unbuckled his seatbelt. But that happened *after* the police had pulled him over. (R. 270). In December of 2005, he was picked up for an old warrant in Illinois for failure to pay fines related to fleeing from the police. (R. 270-71).

Mr. Masek has lived at Beekon House since October of 2004. (R. 259). There are no organized activities at Beekon House, and Mr. Masek is not assigned to do any tasks. (R. 271-72). His routine is to wake up in the morning, have some coffee, and then either play video games or go back to bed. (R. 271, 273, 278). He stopped reading since he didn't have the money to pay an overdue fine at the library. (R. 289). He bathes independently once a week,

and cleans his room every couple of weeks. (R. 284-85, 271). He can prepare meals, go shopping, handle monetary transactions, and do laundry. (R. 286-87). He has an "apartment type roommate," whom he considers a friend. (R. 274). He and his roommate both have separate rooms but share the living room and kitchen. (R. 274). His roommate works during the day, but usually cooks dinner and cleans the common areas. (R. 274, 287). Sometimes, Mr. Masek allows this to happen because he wants things done for him. (R. 288).

On Wednesdays, Mr. Masek walks to the drop-in clinic at MFS and also attends a social group. (R. 272-73). He has a sense of responsibility to get up, get dressed, and attend groups. (R. 286). On occasion, Mr. Masek uses public transportation including the bus, train, and Red Line. (R. 273). When he takes public transportation he feels like he wants to get off, but he is able to stay on and get to his destination. (R. 273).

Mr. Masek used to take alcohol and drugs to self-medicate when he was not taking any prescriptions. (R. 274-75). However, he did not use any alcohol during his time at Beekon House since he was able to go see the doctor when he needed to and was on medication. (R. 274-75). The last time he abused alcohol was in August of 2004 when he tried to kill himself. (R. 275). Since then, he occasionally has wine with a meal but does not get drunk. (R. 275). He has not used marijuana since he has been at Beekon House. (R. 275).

Mr. Masek testified that he cannot work because he is afraid he will lose his job quickly due to his depression. (R. 275). Yet, he later testified that he has not attempted to seek employment since 2004, when he started medication, per his lawyer's advice to wait until his Social Security case was resolved. (R. 282). He says that his medication is helpful to a point but that he still has suicidal thoughts and some depression, and probably needs to talk to his doctor more to see if he can work on something else. (R. 276). When he first starts taking

13

medication it picks him up after about a month, and then after a while he drops back down into a rut where he doesn't feel like going out of the house. (R. 276). He feels better when he gets out of the house often. (R. 276). Changes, like losing his wallet, are the types of things that bring on feelings of depression. (R. 276).

## 2.
## Medical Expert's Testimony

Dr. Ellen Rosenfeld, a clinical psychologist who treats children, adolescents, and adults, testified that Mr. Masek's major depressive disorder does not meet the B or C criteria of the Listings. (R. 34, 71, 202-03, 278). She opined that Mr. Masek is only moderately (not markedly) limited in activities of daily living, social functioning, and concentration, persistence and pace. (R. 34-35, 289-90). The depression restricts Mr. Masek somewhat in performing daily activities, but he has demonstrated that he can go to the store, cook a meal, clean his room, and shop. (R. 289-90). He only relies on his roommate because his roommate is willing to do work for him. (R. 290). In social relationships, Mr. Masek sometimes defensively anticipates negative interactions based on his childhood experience, but he is capable of appropriate and adaptive interactions, as evidenced by his interactions with his roommate, participants in group therapy, and people on public transportation. (R. 290-91).

He has some limitations in concentration, but he demonstrates that he can concentrate at group therapy and on public transportation. (R. 291). On the Mental Residual Functional Capacity Assessment ("RFC"), Mr. Masek is moderately limited in his ability to understand and remember detailed instructions as evidenced by his occasional difficulty at jobs that require him to perform more than simple routine tasks. (R. 292). These difficulties occurred, however, prior to treatment. (R. 292). Mr. Masek's transcripts were ambiguous in terms of his alleged learning disability; his standardized test scores were average to above average. (R. 283-84).

The ME stated that there would have to be evidence in the record of repeated episodes of decompensation after the alleged onset date to indicate a residual disease process under the C criteria. (R. 307-09). The ME found documented evidence of only one episode of decompensation, the hospitalization from August to October 2004 following Mr. Masek's suicide attempt. (R. 35, 278-79). The ME determined that Dr. Ranganathan's notes do not show evidence of deterioration or increased suicidal thoughts over time, and therefore do not support Dr. Ranganathan's assertion that Mr. Masek has experienced repeated episodes of decompensation greater than two weeks, or the assertion that a minimal increase in mental demands or a change in environment would be predicted to cause Mr. Masek to decompensate. (R. 35-36, 279, 307-10).

Rather, Dr. Ranganathan's treatment notes show that Mr. Masek has responded favorably to medication: when he is compliant with his medication he is stable, sleeps well, travels with a friend, and denies suicidal ideation. (R. 35, 280). He would likely be successful in an employment position if on medication, since he has shown that he can maintain some interests and relationships while medicated. (R. 281-82). Mr. Masek's failure at his last job occurred prior to his treatment in 2004. (R. 281). On the other hand, when Mr. Masek is off medication his depressive symptoms increase. (R. 35, 279). These symptoms cannot be characterized as a period of decompensation. (R. 279). Mr. Masek is currently being seen for medication management and he is no longer attending weekly therapy sessions. (R. 281).

The ME pointed out that Dr. Ranganathan changed his opinion from August 2005, when he did not predict that increased mental demands would cause decompensation, to November 2006, when he did make such a prediction. (R. 35-36, 301-04). In the ME's opinion, the treatment notes of this psychiatrist do not provide a factual basis for this change in Mr. Masek's

condition. (R. 35, 301-04). The ME also relied on the psychiatric consultative evaluation, which found Mr. Masek intact with reality, without memory impairments, but with judgment impaired. (R. 36, 284). The ME agreed with Dr. Ranganathan's initial assessment that Mr. Masek is not living in a highly supportive and protective setting. (R. 36, 296). She also found that there were no drug or alcohol dependency issues material to the finding of disability in this case. (R. 293).

### 3.
### Vocational Expert's Testimony

Susan Ettinberg testified as a vocational expert. (R. 313). She stated that Mr. Masek's past relevant work included unskilled positions, at various exertional levels from light to medium and possibly heavy. (R. 313-14). The ALJ asked the VE a hypothetical question regarding the existence of jobs for a person of Mr. Masek's age, education, and past relevant work experience, who had no exertional limitations but was limited to jobs where he would perform simple routine tasks, occasionally interact with the general public and supervisors, occasionally experience changes in work setting, occasionally need to use work-related judgment and decision-making, and not have to work at a production rate pace. (R. 314).

The VE replied that this individual could perform some of Mr. Masek's past jobs, including the dishwasher job and warehouse stocker. (R. 315). She also explained that this individual could perform other jobs in the regional economy including housekeeper (light, 22,000 jobs in the Chicago metropolitan area) and janitor (medium, 60,000 jobs in the area). (R. 41, 316-17). The VE said she did not have the DOT codes for these jobs, but could provide them later (R. 319, 336). She did, on the very next day. (R. 123).

The ALJ then asked whether adding to the hypothetical the requirement of occasional interaction with co-workers would change the outcome. (R. 317). The VE replied that it would not, and explained that interaction in the vocational sense means a team approach to tasks; such

16

an approach would not be required by the listed jobs. (R. 41-42, 317). The VE also explained that in order to maintain productivity at these jobs, one would need to be on task for 85-90% of the workday. (R. 318). All the jobs require getting the job done, but not all have quotas. (R. 41, 315-16, 334). In response to questions by Mr. Masek's attorney, the VE elaborated that a change in work setting means you are assigned to different tasks on different days or throughout the day. (R. 325). In all of the jobs just defined, there is an element of the employee needing to be able to accept instructions and respond appropriately to criticism from supervisors. (R. 323). One incident of profanity or walking off the job, for instance, is enough to say that the employee cannot accept instructions or respond appropriately to criticism. (R. 330-31).

### III.
### THE ALJ'S DECISION

The ALJ held that Mr. Masek has not been under a disability within the meaning of the Act primarily because he did not meet the conditions set forth under steps three and five of the five-step sequential inquiry required by Social Security Regulations. (R. 29-30, 34, 40-42). Under step one, the ALJ found that Mr. Masek had not engaged in substantial gainful activity since October 15, 2004, the alleged onset date. (R. 30). Under step two, the ALJ found that reports made by doctors Zarif, Ranganathan, and Nelson supported a finding of severe impairments including: major depressive disorder, recurrent, or affective disorder, and history of polysubstance abuse in full sustained remission. (R. 30-34).

The ALJ found that under step three, Mr. Masek did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 34). In coming to this determination, the ALJ placed the most weight in Dr. Rozenfeld's testimony as a medical expert. (R.34-37). The ALJ acknowledged Dr. Zarif's assessment but noted that it was based on Mr. Masek's condition on

August 20, 2004, the day after his hospitalization. (R. 34). The ALJ also acknowledged Dr. Ranganathan's 2005 and 2006 assessments, but expressed concern that both did not contain reference to any specific facts supporting the claim that Mr. Masek had marked difficulties in maintaining concentration, persistence, and pace, or that he had repeated episodes of decompensation. (R. 34). Rather, the ALJ found that the record contained only one documented episode of decompensation, the 2004 hospitalization. (R. 35). She also did not give any weight to the unsigned note from "Tinley Med. Records" handwritten on commercial notepaper with the letterhead of a drug manufacturer indicating certain dates of service for Mr. Masek. (R. 35). The ALJ also agreed with Dr. Rozenfeld that Mr. Masek is mildly restricted in the activities of daily living, and moderately limited in maintaining social functioning, and in concentration, persistence and pace. (R. 35).

In coming to this conclusion, the ALJ considered Dr. Rozenfeld's and Mr. Masek's testimony relating to his successful interaction with his roommate and in group, and his ability to shop, cook, handle money, and use public transportation. (R. 36). The ALJ also considered Mr. Masek's testimony that the reason he had not looked for a job was because he had been advised not to during pendency of his Social Security Disability case. (R. 37). In evaluating Dr. Ranganathan's assessment, the ALJ noted that Dr. Ranganathan left blank in both of his reports the items of activities of daily living and social functioning. (R. 34). She also expressed concern that Dr. Ranganathan changed his opinion from August 2005, when he did not predict that increased mental demands would cause decompensation, to November 2006, when he did make such a prediction. (R. 34-35). The ALJ agreed with the ME's opinion that Dr. Ranganathan did not provide a factual basis for supporting his assessment of the deterioration of Mr. Masek's condition during that period. (R. 35-36).

Rather, she found that the doctor's contemporaneous treatment notes supported a conclusion that Mr. Masek had been responding favorably to medication. (R. 35). As to the third element of the C criteria, the ALJ agreed with Dr. Rozenfeld's assessment that Mr. Masek was not living in a highly supportive and protective setting, and there was no evidence in the record of deterioration or increased suicidal thoughts to support a claim that Mr. Masek had a residual disease process whereby increased demands would lead to compensation. (R. 36-37). She noted that Dr. Ranganathan had given inconsistent answers to this question, even though his living situation had not changed between the times of the two reports. (R. 36).

The ALJ found that with no exertional limitations, Mr. Masek has the residual functional capacity to perform simple routine tasks without a production rate pace, occasionally interact with the general public, supervisors, and co-workers, occasionally adapt to changes in the work setting, and occasionally exercise work-related judgment and decision-making. (R. 37). In coming to this conclusion the ALJ did not give controlling weight to the treating psychiatrists since Dr. Ranganathan's reports were inconsistent and not sufficiently supported by facts in his own treatment notes. (R. 38). Moreover, Dr. Ranganathan stated that assessing Mr. Masek's ability to function in a competitive work setting was "beyond the scope of my interaction with plaintiff," even after treating him for ten months. (R. 38). Dr. Zarif did not treat Mr. Masek after he left the hospital in 2004. (R. 38). The ALJ gave substantial weight to Dr. Rozenfeld's opinion, which synthesized all treatment records, the opinions of the treating and examining sources, and the DDS. (R. 38). The ALJ found that Mr. Masek exaggerated his claim of a learning disability for consideration of adult disability since his school report says he graduated with a standard high school diploma and average grades. (R. 39).

Furthermore, during the two hour hearing his speech was normal and clear. (R. 39). The ALJ also found that Mr. Masek's testimony about the limiting nature of his depression was not entirely consistent with the medical record, based on his success in the group home, the fact that he was advised not to seek work, and because Dr. Zarif noted that he does well when he has a job and a place to stay. (R. 40). Although the ALJ found that Mr. Masek could not perform any past relevant work, she refused to decide the case at step four since the vocational history was imprecise. (R. 40-41). At step five, the ALJ found, based on the testimony of the VE, and considering Mr. Masek's age, education, work experience, and residual functional capacity, that jobs existed in significant numbers in the national economy that Mr. Masek could perform. (R. 41). For these reasons, the ALJ concluded that a finding of "not disabled" was appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines. (R. 42).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not

entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544; *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008).

## B.
## Five-Step Sequential Analysis

Section 423(d)(1) defines "disability" as an: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n.1 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
## Analysis

Mr. Masek calls several aspects of the ALJ's opinion into question. First, he claims that the ALJ did not give proper weight to the opinions of his treating physicians. (Brief of Plaintiff at 6). Second, he argues that the ALJ failed to take the complete testimony of the VE into account. (Brief of Plaintiff at 12). Third, he contends that the VE's testimony was not consistent with the Dictionary of Occupational Titles ("DOT"). (Brief of Plaintiff at 13). Finally, Mr. Masek submits that the ALJ improperly analyzed his credibility under Social Security Ruling ("SSR") 96-7p. (Brief of Plaintiff at 15). None of Mr. Masek's arguments are

convincing. After considering them and reviewing the evidence, it must be said that the ALJ's decision is and must be affirmed.

## 1.
### The ALJ Gave Proper Weight to the Treating Physicians' Opinions

Mr. Masek argues that the ALJ should have given controlling weight to the opinions of his treating physicians, instead of to Dr. Rozenfeld, a non-treating medical expert, who testified that Mr. Masek did not meet the 12.04 (C) requirements. (Brief of Plaintiff at 6). Mr. Masek claims that he meets the functional limitations standard for Listing 12.04 (C) based on four reports: 1) Dr. Zarif's 2004 intake assessment stating that Mr. Masek had experienced 1-2 episodes of decompensation within the last twelve months; 2) Dr. Ranganathan's 2005 Mental Disorders Report also stating that Mr. Masek had experienced 1-2 episodes of decompensation; 3) Dr. Ranganathan's 2006 Mental Disorders Report stating that Mr. Masek had experienced repeated episodes of decompensation and had a residual disease process whereby small increases in mental demands or change in environment could cause decompensation; and 4) Dr. Nelson's report stating that Mr. Masek has been "chronically fairly severely depressed since the age of six," has made twelve suicide attempts, and has undergone significant social withdrawal. Brief of Plaintiff at 6-7; (R. 14, 131, 186-87, 226).

Although Mr. Masek attempts to build an evidentiary record in support of his case, the issue fundamentally comes down to whether the ALJ should have placed more weight on Dr. Ranganathan's 2006 report or on the medical expert's testimony. Dr. Ranganathan's 2006 report is the only report that directly addresses the C criteria, applies to the relevant timeframe, and is based on a third party's independent assessment and not solely on Mr. Masek's self-report. Dr. Zarif's report, on the other hand, was written only one day after Mr. Masek was admitted to Madden for attempted suicide. (R. 131). The fact that Dr. Zarif noted that Mr. Masek had 1-2

23

episodes of decompensation, does not mean that he experienced repeated episodes of decompensation. (R. 131). "Repeated episodes of decompensation, each of extended duration" is defined as 3 episodes within 1 year, or an average of every 4 months, each lasting for at least 2 weeks. (R. 35) (citing Listing 12.00 B 4). Dr. Ranganathan's 2005 report is not conclusive for the same reason. Recall that Mr. Masek characterized unfastening his safety belt after police had pulled him over as a "somewhat" suicide attempt.

Dr. Nelson's report does not directly address the C Criteria, and Dr. Nelson's notation regarding Mr. Masek's twelve suicide attempts is based solely on Mr. Masek's self-report and not any independent medical evidence. (R. 186). Because Dr. Ranganathan's reports contain significant and revealing internal inconsistencies, and his conclusion in 2006 was not supported by his treatment notes, the ALJ correctly placed greater weight in the testimony of the medical expert. Typically, a treating source's opinion on issues of the nature and severity of a medical impairment is entitled to controlling weight, so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, including his treatment notes. SSR 96-2p; *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009); *Schmidt*, 496 F.3d at 842; *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)).

Where the ALJ gives the treating physician's opinion little or no weight, the ALJ must cite to a medical report or opinion that is inconsistent with the treating physician's opinion and provide "good reasons" for the weight accorded to a treating physician's opinion. SSR 96-5p; *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *Clifford*, 227 F.3d at 870. If the testimony of a non-examining medical consultant contradicts the report of a treating physician, there is no inflexible rule that requires that the ALJ prefer the testimony of the latter. That

would result in an automatic and inflexible rule of preference which would preordain the result in every case. As the Seventh Circuit has repeatedly made clear, there is no such rule. *Zeigler Coal Co. v. Office of Workers' Compensation Programs,* 490 F.3d 609, 616 (7ᵗʰ 2007)("We 'have disapproved any mechanical rule that the views of a treating physician prevail.'"). A treating physician's opinion concerning the nature and severity of a claimant's impairments receives controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "consistent with substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2). *See Luster v. Astrue,* 2010 WL 21194 (7th Cir.2010)(unreported); *Simila,* 573 F.3d at 513; *Ketelboeter,* 550 F.3d at 625.

While the treating physician's opinion is important because he has been able to observe the claimant over an extended period of time, that very extended involvement may also make the opinion unreliable. Indeed, the cases are uniform in recognizing that a treating physician's extended involvement with a patient may make him sympathetic to his patient when he becomes a claimant and prone to "too quickly find disability." *Ketelboeter,* 550 F.3d at 625. *See Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007). Indeed, it "is well known [that] many physicians (including those most likely to attract patients who are thinking of seeking disability benefits, ..)) will often bend over backwards to assist a patient in obtaining benefits." *Hofslien,* 439 F.3d at 377 (parenthesis in original). *Accord Schmidt,* 496 F.3d at 842.

In assessing the credibility of the treating physician's opinion, an ALJ may, look to those indicia of credibility that traditionally are utilized by triers of fact. Thus, if it is internally inconsistent, or if it is based solely on the patient's subjective complaints, the ALJ may discount it. *Ketelboeter,* 550 F.3d at 625; *White v. Barnhart,* 415 F.3d 654, 659 (7th Cir.2005).

25

Obviously, one way to test this is to compare a treating physician's disability opinion, likely procured in these cases by an attorney for the purposes of advancing a client's claim for benefits, with the record as a whole, or that physician's own record of treatment. Alarm bells may rightly be thought to sound to the ALJ if a dire assessment of the claimant's ability to work follows on the heels of a fairly benign medical record. That's what the ALJ saw here.

The ALJ must determine the appropriate weight to accord the opinion of a treating physician based on the following factors: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by the record; (4) consistency of the opinion with the record; (5) the treating physician's specialization. *See* 20 C.F.R. 404.1527(d)(2); *See also Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). An ALJ is not required to give great weight to a treating source if the evidence is seriously flawed. *See Bauer*, 532 F.3d at 608.

In the instant case, unlike many in which reversals were appropriate, the ALJ did not ignore large bits of evidence or those that contradicted his ultimate conclusion. Quite the contrary. The ALJ here thoroughly discussed all available evidence in concluding that Mr. Masek does not have an impairment that meets or medically exceeds one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 34-37). In determining the amount of weight to place on Dr. Ranganathan's 2006 report, the ALJ took issue with subparts (3) and (4) of 20 C.F.R. § 404.1527(d), finding that Dr. Rozenfeld's conclusions were internally inconsistent and not supported by the record. Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. 20 C.F.R. § 404.1527(c)(2); *Clifford*, 227 F.3d at 871. As noted, controlling weight need not be given when a treating

physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the plaintiff's own testimony. *Schmidt*, 496 F.3d at 842.

The fact that the record only contained documented evidence of one episode of decompensation – the 2004 hospitalization – does not support Dr. Ranganthan's claim that Mr. Masek experienced repeated episodes of decompensation. (R.35). Once Mr. Masek began regular psychiatric treatment through medication management, Dr. Ranganathan's notes do not mention any further episodes of decompensation or attempted suicide. (R. 35). Neither are Mr. Masek's reports of numerous suicide attempts and psychiatric hospitalizations supported by any independent medical evidence. (R. 35).

It is well-settled that an ALJ may disregard a medical opinion premised on a claimant's self-reported symptoms if the ALJ has reason to doubt the claimant's credibility. *Rice v. Barnhart*, 384 F.3d 363, 370-71 (7th Cir. 2004)("Medical opinions upon which an ALJ should rely had to be based upon objective observation and not amount merely to a recitation of a claimant's subjective complaint."); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir.1995) (administrative law judge could reject portion of physician's report based upon plaintiff's own statements of functional restrictions if administrative law judge finds plaintiff's subjective statements not credible); *Mastro v. Apfel*, 270 F.3d 171, 177-78 (4th Cir.2001) (affirming administrative law judge's disregard of treating physician's opinion because opinion "was based largely upon claimant's self-reported symptoms" and not supported by objective medical evidence); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir.1999) (physician's opinion of disability premised to large extent on claimant's own accounts of symptoms and limitations may be disregarded where those complaints have been properly discounted). Section 4 of this opinion discusses why the ALJ had adequate grounds for

discounting Mr. Masek's subjective statements as not credible, and can therefore reject opinions based on those statements. *See infra* at 40.

Dr. Ranganathan's treatment notes do not contain factual indications that a minimal increase in mental demands or a change in environment would be predicted to cause Mr. Masek to decompensate. (R. 35). The treatment notes indicate a favorable response to medication and show that depressive symptoms increase when medication is discontinued. (R. 35). Dr. Rozenfeld pointed out that Dr. Ranganathan changed his opinion from August 2005, when he did not predict that increased mental demands would cause decompensation, to November 2006, when he did not make such a prediction. (R. 36). Certainly, over a period of two and a half years, a doctor may change his opinion about his patient's condition. However, the ME was correct in finding that the treatment notes did not provide a factual basis for the alleged deterioration in Mr. Masek's condition. (R.36).

Dr. Rozenfeld also gave inconsistent answers to the question of whether Mr. Masek was unable to function outside of a highly supportive living arrangement in his two reports: in the first report he answered "no, patient currently resides in group home – not highly structured." (R. 36). In his second report he answered "yes," even though Mr. Masek's living situation had not changed. (R. 36). The fact that Dr. Rozenfeld stated "the file evidence is really very consistent," is not evidence that Dr. Ranganathan's two reports were consistent. (R. 280). Dr. Rozenfeld's statement referred to the consistency between Dr. Nelson's description of Mr. Masek's ability to function in terms of the B criteria and the description by the treating source. (R. 280). Even if the statement did mean that the notes of doctors Zarif, Ranganathan, and Nelson were consistent, the testimony continues on to say that the consistent part was that the

treating source records indicated a favorable response to medication, no episodes of suicidal ideation, ability to interact adequately, and a sense of fragility. (R. 280-81).

Mr. Masek argues that the ALJ had a duty to recontact Dr. Ranganathan in order to clarify the inconsistencies in his two reports. Brief of Plaintiff at 10. In support of his argument, Mr. Masek cites to *Barnett v. Barnhart*, 381 F.3d 664, 669-70 (7th Cir. 2004): "If the ALJ thought he needed to know the basis of [medical] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them." *Barnhart* is distinguishable from this case.

In *Barnhart,* the treating physician's treatment notes were consistent with his opinion; the ALJ just improperly disregarded them. 381 F.3d at 669. Contrary to Mr. Masek's arguments, the Social Security Regulations state that additional "development should not be undertaken for the purpose of determining whether a treating source's medical opinion should receive controlling weight if the case record is otherwise adequately developed." SSR 96-2p. The Code of Federal Regulations similarly asserts that an ALJ will recontact a treating physician only if the evidence received from the treating physician is "inadequate" to determine whether the plaintiff is disabled. 20 C.F.R. § 404.1512(e); *see also* 20 C.F.R. § 404.1527(c)(3).

The record as a whole in this case is adequately developed. (R. 232, 235-36, 238-44). This was not a case in which the basis of the medical opinions required explication. The problem was not the ALJ's inability to apprehend the underlying basis of the testimony, but rather with the testimony, itself, when considered against the other evidence in the case. The ALJ found it wanting. But that did not mean that he erred in not soliciting further explanations from them. If that were required, there would never be an end to a disability hearing. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (the ALJ was not required to recontact

29

treating physician for additional evidence since the evidence was adequate to find that the plaintiff was not disabled); *see also Skinner v. Astrue*, 478 F.3d 836, 843-844 (7th Cir. 2007).

The ALJ did not, as the plaintiff claims, misunderstand the effects of depression through an inconsistent use of the word "stable." (Brief of Plaintiff at 10). This case differs from *Bauer*, 532 F.3d at 609, where the court reversed the district court's decision to deny benefits after reasoning that little weight should be given to the treating physician whose treatment notes contained "hopeful remarks" to the effect that the plaintiff was "ok" and doing "fairly well" and levels of functions had improved and so on. As a consequence of these remarks, the ALJ gave "little weight" to the psychiatrist's conclusion that the plaintiff could not work full time. For the court, this reflected a "lack of understanding of bipolar disorder." 532 F.3d at 609.

A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is, the court said, likely to have better days and worse days. This is especially true for those with bipolar disorder, "that responds erratically to treatment." *Id.* But it would be a misreading of *Bauer* to conclude that anyone with a psychiatric condition is automatically entitled to Social Security benefits because they are disabled. *Bauer* did not pretend to announce such a holding, nor does any other case. Its thrust was to make clear to ALJs that "hopeful" statements in treatment notes are not the basis to reject the finding of treating psychiatrists that the patient cannot hold down a full time job.

In the instant case, the ALJ did not simply rely on episodic, "hopeful" observations in a doctor's treatment notes to reject the claim for benefits. Rather, the ALJ looked at the consistency of the observations and the plaintiff's positive behavior and response to medication. More importantly, these positive treatment notes were only part of the larger universe of evidence that the ALJ expressly considered and, which consisted in part of the treating doctor's

unexplained 2006 *volte face,* other contrary medical testimony, inconsistencies in the treating physician's notes and assessments, and in his credibility assessment of the plaintiff, which the ALJ adequately explained. These are proper factors to be considered by an ALJ in evaluating the evidence as a whole and enhances the conclusion that the plaintiff's claim is less probable than it would be were the facts otherwise. *Cf. Parker v. Astrue,* _F.3d_, 2010 WL 851412, *2 (7th Cir. 2010)("And if the presence of objective indicators thus makes a claim more plausible, their absence makes it less so. It would be a mistake to say 'there is no objective medical confirmation of the claimant's pain; therefore the claimant is not in pain.' But it would be entirely sensible to say 'there is no objective medical confirmation, and this reduces my estimate of the probability that the claim is true.'").

## 2.
### The ALJ Appropriately Addressed the Vocational Expert's Testimony

Mr. Masek argues that the ALJ failed to properly consider the testimony of the VE, when the VE stated that even one inappropriate interaction with a supervisor or the public could result in firing. (R. 330-31); (Brief of Plaintiff at 12). Of course, the observation could apply to any individual. In any event, Mr. Masek then argues that his attempted attack on another patient who teased him during his 2004 hospitalization shows that he is incapable of handling the pressures of a competitive work environment. *Id.* In so arguing, Mr. Masek ignores the thrust of the VE's testimony that a hypothetical person with Mr. Masek's restrictions could perform work in the national economy. (R. 316-17).

He also asks the court to substitute his own, understandably partisan assessment of his ability to interact with coworkers and supervisors, for that of the medical professionals reviewing his case. (Brief of Plaintiff at 12). [1] The VE's testimony was not in and of itself

---

[1] A claimant for Social Security benefits has an obvious economic interest in the outcome of the case.

evidence of disability. (R. 313-34). She did not state that Mr. Masek was likely to decompensate and have a negative interaction with a supervisor. *Id.* To the contrary, a substantial portion of the evidence suggests that Mr. Masek is not likely to decompensate in a work setting so long as he continues to stay on medication. The ALJ's finding with respect to Mr. Masek's ability to perform unskilled work is supported by substantial evidence. Social Security Ruling 85-15 states the standard an ALJ must use in assessing the impact of mental illness on the ability to perform work:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

SSR 85-15. Neither the VE's testimony, nor the evidence of record, demonstrates a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations.

The ALJ's hypotheticals incorporated the limitation that Mr. Masek could only perform tasks where there was occasional interaction with the general public, supervisors, and coworkers. The VE found that Mr. Masek could work as a housekeeper or janitor. (R. 314, 317). An ALJ's hypothetical need not include every possible limitation in the record; only those supported by the medical evidence. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). This is especially the case when the vocational expert has the opportunity to learn of the plaintiff's limitations through, for example, an independent review of the medical records or through other questioning at the hearing. *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2007). Here, the VE assessed that Mr. Masek was not limited in his ability to perform work based on her review of all the evidence.

The facts here are comparable to *Fisher v. Astrue*, 2007 WL 41503147, *9 (S.D.Ind. 2007)(Hamilton, J.), where although the claimant testified that she would have difficulty getting along with her boss because of a lack of patience, and an inability to control her feelings, the evidence showed that she was able to work while in prison, could supervise her three sons for one night each week, and was not significantly limited in any area of social interaction according to her doctor. Because the evidence tended to show that the claimant was not substantially limited in her ability to maintain basic relationships with supervisors and others, Judge Hamilton concluded that the ALJ's hypothetical requiring not more than superficial interaction with the general public, coworkers, or supervisors, sufficiently took the claimant's mental illness into account. *Id.* [2]

Mr. Masek's attack on a fellow patient shortly after his suicide attempt does not mean that the ALJ's finding that he could function in a work environment is not supported by substantial evidence. (R. 156). The incident occurred before stabilization on medication and therapy. (R. 132). There is no evidence to conclude that if Mr. Masek was on medication and had only limited interactions with other people while working as a housekeeper or janitor, that he would physically attack his coworkers or respond inappropriately. Overall, Dr. Zarif frequently noted that Mr. Masek was pleasant, cooperative, and appropriate in group settings. (R. 134, 136, 137, 139-40, 144, 150).

---

[2] In *Fisher,* the applicant's health care providers noted various impressions of her mental state, including: dysthymia disorder, major depression, recurrent, moderate, and panic disorder with agoraphobia, depression, major depression and panic disorder with agoraphobia, no mental illness aside from alcohol dependence, double depression with history of dysthymia, double depression with history of dysthymia, to the point of recent exacerbation to major depression, major depression with psychosis, major depression single, major depressive disorder, recurrent, severe with psychotic features. Nonetheless, Judge Hamilton sustained the Commissioner's conclusion that Ms. Fisher was not disabled and could perform simple and repetitive work not requiring more than superficial interaction with other people. 2007 WL 4150314 at * 2.

Mr. Masek also argues that he had a history of impulsive behaviors that would often land him in jail including breaking into a cash register at his work place and fleeing from police following a suicide attempt. (Reply Brief for Plaintiff at 4). In considering the weight one should place on these incidents, it should be noted that all of them are by self-report, and that there is no documentation of any hospitalization or incarceration other than what was reported by Mr. Masek himself. But even if these events occurred, there is no claim that they happened while Mr. Masek was on medication and receiving therapy.[3] Since the thrust of the doctors' and experts' evaluations are that Mr. Masek is likely to be successful in a work environment if he is on medication, the incidents to which the plaintiff alludes did not preclude the ALJ from concluding that Mr. Masek could function in the limited work environment recommended by the VE.

In the RFC, the medical consultant ("MC") wrote that Mr. Masek's basic social skills were functional, but that he lacked the temperament to cope with frequent interactions with others. (R. 190). The MC evaluated Mr. Masek as not significantly limited in his ability to accept instructions and respond appropriately to criticism from supervisors, his ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and his ability to maintain socially appropriate behavior; and moderately limited in his ability to interact appropriately with the general public. (R. 189). The ALJ's hypothetical took this assessment into consideration.

---

[3] Mr. Masek wisely does not argue that he is disabled because if he did not follow his medical regimen then he would be unable to interact with others and thus, unemployable, for it is basic that failure to follow a prescribed course of remedial treatment without good cause can be grounds for denying an application for benefits, 20 C.F.R. § 416.930(a) and (b); *Johnson v. Apfel,* 240 F.3d 1145, 1148 (8th Cir.2001); *Kisling v. Chater,* 105 F.3d 1255, 1257 (8th 1997), and can weigh against a claimant's credibility. *Guilliams v. Barnhart,* 393 F.3d 798, 802 (8th Cir.2005).

Dr. Ranganathan's reports were inconsistent on the subject. (R. 224, 243). On August 22, 2005, he noted that coping with supervisors, co-workers, and the public would not trigger the patient's symptoms. (R. 224). On November 8, 2006 he wrote that coping with supervisors, coworkers, and the public could sometimes trigger plaintiff's symptoms. (R. 243). His treatment notes do not document any reasons for this change in conclusion, but rather suggest that Mr. Masek was responding well to medication management and had a good prognosis provided that he maintained compliance with treatment and refrained from substance abuse. (R. 224). Finally, the ME testified that Mr. Masek was moderately limited in social functioning, and that he would likely be successful in an employment position if on medication. (R. 281-82, 289-90).

The record contains substantial evidence that Mr. Masek retains "the ability to respond appropriately to supervision, coworkers, and usual work situations," and is thus not disabled at step five. SSR 85-15. *See Foster v. Barnhart,* 2006 WL 3206273, at *13 (S.D. Ind. 2006)(Hamilton, J.) (ALJ's decision supported by substantial evidence when relying on opinions of three state agency psychologists who concluded claimant did not have a mental impairment that significantly affected her ability to do unskilled work based in part on her ability to perform daily living activities, such as grooming, dressing, bathing, maintaining social activities, attending church, and concentrating well enough to read and watch television for a few hours each day).

Furthermore, the ALJ's decision not to award disability benefits was manifestly not based upon the obvious and undeniable statement that one inappropriate interaction could result in firing. The observation calls to mind Judge Easterbrook's classic rejoinder to irrelevant arguments in *Israel Travel Advis. Serv. v. Israel Iden. Tours,* 61 F.3d 1250, 1259 (7th Cir. 1995), "So What?...Who cares?...True, but irrelevant." It is simply beyond debate that anyone who has

a significantly adverse encounter with an employer can get fired. But that is irrelevant to the question of whether the ALJ's conclusion in this case is supported by sufficient evidence. And, whether the ALJ took cognizance of that observation is also besides the point, for even if he did so, it is not comparable to having ignored an entire line of evidence. (R. 330-31) (Brief of Plaintiff at 12).[4] The ALJ in this case did not ignore any affirmative evidence about Mr. Masek's condition.

The observation on which the plaintiff focuses inordinately was not evidence of a medical condition or of disability. The question is not whether one might get fired if there is a serious enough problem with an employer, but whether Mr. Masek's medical conditions are such that that sort of encounter seems probable. The evidence revealed it is not so long as he maintains his current regimen of medication and therapy. Under the *Zblewski* standard, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position. 732 F.2d at 79. The observation about job loss does not qualify as considerable evidence.

---

[4] For example, in *Kastman v. Barnhart*, 2002 WL 1461499, at *11 (N.D. Ill. 2002), the district court held that the ALJ ignored an entire line of evidence when he did not discuss testimony by eight doctors indicating that the claimant had experienced repeated episodes of deterioration in work, had a poor prognosis for controlling his problems, and repeatedly complained of depression, insomnia, and anxiety. Unlike in *Kastman*, the ALJ in this case did refer to evidence to persuade a reasonable person that Mr. Masek's limitation would not significantly diminish the employment opportunities otherwise available to him. *See also Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (remanding because ALJ improperly ignored three lines of evidence including evidence of bowel and bladder dysfunction, limited ability to bend on account of a bad back, and propensity to drop objects due to tingling in his hands); *Zblewski v. Schweiker* 732 F.2d 75, 78 (7th Cir. 1984) (reversing decision to deny social security benefits in part because ALJ explicitly instructed vocational expert to exclude from consideration claimant's ulcer and the testimony concerning nervousness).

**3.**

## The ALJ Complied With the Requirements of SSR 00-4p

The ALJ complied with the requirements for taking testimony from a vocational expert under SSR 00-4p. The language of SSR 00-4p states that the adjudicator has an affirmative responsibility to ask the VE if the evidence he or she has provided conflicts with information provided in the DOT; and, if the VE's evidence appears to conflict with the DOT, the adjudicator must obtain a reasonable explanation for the apparent conflict. Mr. Masek argues that the ALJ failed to meet her duty because at no time during the VE's testimony did she ask if that testimony was consistent with the DOT. (Brief of Plaintiff at 13). The Commissioner concedes that the ALJ failed to fulfill this duty, but such error is harmless. See Ketelboeter, 550 F.3d at 625-26(applying harmless error analysis where ALJ did not ask if_VE's testimony conflicted with the DOT).

The record shows that the ALJ clearly considered the issue of whether to accept the VE's testimony based on her own evaluation of its consistency with the DOT. The ALJ asked the VE, on three separate occasions, to submit copies of the DOT numbers to both the ALJ and the plaintiff's lawyer within seven days of her testimony. (R. 319, 322-23, 336). One day later, the VE faxed a copy of the codes as requested. (R. 123). The ALJ incorporated the DOT numbers into her final opinion, and then stated, "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the DOT." (R. 41-42). Based on the information before her, the ALJ legitimately used her discretion in determining how much weight to give the VE's testimony. *See* 20 C.F.R. § 404.1566(d), (e) (2007) (the regulations allow the ALJ to rely on either the VE or the DOT when making a determination regarding available work for the claimant); *see also Powers v. Apfel,* 207 F.3d 431, 436-37 (7th Cir.2000) (ALJ is permitted to rely on expert testimony even if it contradicts the DOT); *Stark v. Astrue,*

37

278 Fed. Appx. 661, 667 (7th Cir. 2008) (where the VE's testimony did not present any apparent conflict with the DOT, the ALJ had no reason to doubt that the testimony was consistent with the DOT; the absence of an apparent conflict at the time of the hearing supports that the ALJ satisfied her duty when examining the vocational expert).

Despite this minor procedural defect, Mr. Masek attempts to argue that the ALJ should not have relied on the VE's testimony because it was inconsistent with the DOT. (Brief of Plaintiff at 12-15). The VE stated that Mr. Masek could perform two types of jobs in the regional economy, including housekeeper (DOT number 323.687-010) and janitor (DOT number 381.687-014). (R. 41, 316-17). Yet Mr. Masek points out that the job of housekeeper does not properly fall under the ALJ's hypothetical requiring that the individual perform only simple, routine tasks. (Brief of Plaintiff at 13)(R. 314). Instead, the job of housekeeper involves a level 2 reasoning development, which requires that a person "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions[; and d]eal with problems involving a few concrete variables in or from standardized situations." Dictionary of Occupational Titles, 323.687-010.

Such a discrepancy was problematic in *Simms v. Astrue,* 599 F.Supp.2d 988, 1007-08 (N.D. Ind. 2009). In that case, the district court held that the ALJ's assessment that the plaintiff could perform "unskilled simple repetitive tasks" was inconsistent with the DOT descriptions for the jobs identified by the VE requiring a reasoning level of 2. However, the court's reasoning in *Meissl v. Barnhart,* 403 F.Supp.2d 981, 984 (C.D.Cal. 2005) took a closer look at the meanings behind the DOT's categories and is therefore more persuasive.. There, the court held a person limited to carrying out simple, repetitive instructions could still perform a job with a reasoning level of 2 and explained:

38

The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3)("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking ... apprehend the most abstruse classes of concepts" at level six). DOT at 1010-1011. To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

*Meissl*, 403 F.Supp.2d at 984. *See also Mathis v. Astrue*, 2008 WL 484 9028 at * 2-3 (N.D.Ga. 2008).

Moreover, the VE has expert knowledge that the jobs of housekeeper and janitor do comply with the ALJ's hypothetical involving an individual who could perform simple, routine tasks. Yet even if we are incorrect, remanding the case for further proceedings would not impact the outcome of Mr. Masek's claim or bear materially on the conclusion that Mr. Masek was not totally disabled. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Although Mr. Masek claims that the position of janitor also requires level 2 reasoning development and therefore should have been excluded, he is incorrect. The DOT states that the position requires level 1 reasoning, meaning that the plaintiff must be able to "[a]pply commonsense understanding to carry out simple one- or two-step instructions[; and d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." Dictionary of Occupational Titles, 381.687-014. The fact that the janitor position unquestionably conforms to the ALJ's hypothetical shows that the plaintiff could perform work in the national economy under Step 5.

Mr. Masek's additional arguments are also easily disposed of. Mr. Masek notes that the VE described the janitor position as medium-level work, but the title that the ALJ cites in her decision is listed as heavy work. Although Mr. Masek is correct that there is a discrepancy on this point, any error is harmless since the ALJ's hypothetical included an individual who had no exertional limitations. (R. 314).

Mr. Masek finally argues that the VE testimony also showed inconsistency with the DOT through a misunderstanding of quotas and production rate work. (R. 314-20). He claims that at one point, the VE says that working as a housekeeper and janitor are not productivity jobs, but later says that they do have a productivity element and therefore should be excluded under the ALJ's hypothetical of a person who could not perform production rate work. Mr. Masek does not show how this testimony is inconsistent with the DOT. Neither the housekeeper nor the janitor position specifically mentions whether the work must be performed at a production rate pace. Dictionary of Occupational Titles, 323.687-010; 381.687-014. At the most, Mr. Masek is showing an inconsistency in the VE's testimony. However, the VE is actually very clear on the point. She explains that all jobs have a productivity element in terms of getting the job done within a timely fashion. (R. 315). Production rate refers to an assembly line type of job where there are specific quotas in terms of completing so many tasks or creating so many products per hour for numerous clients. (R. 316, 334).

## 4.

### The ALJ Sufficiently Articulated Her Assessment of Mr. Masek's Credibility

In evaluating the credibility of Mr. Masek's testimony, the ALJ complied with SSR 96-7p by considering the entire case record and giving specific reasons for the weight given to the Mr. Masek's statements. In doing so, the ALJ examined the

40

consistency of Mr. Masek's statements, both internally and with other information in the record. SSR 96-7p. The ALJ ultimately concluded that Mr. Masek's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible since they were not entirely consistent with the medical record. (R. 39-40).

"[O]f course, the administrative law judge did not have to believe" Mr. Masek, *Sarchet,* 78 F.3d at 307, or accept his testimony at face value. Under the Social Security Act, administrative law judges are not wooden participants in an empty ritual, the preordained end of which is to award benefits to those in distress, regardless of whether they qualify under the Act. The purpose of a social security hearing is to enable the ALJ to determine where the truth lies and to administer the Act in conformity with Congress's carefully crafted statutory framework. Administrative law judges are functionally comparable to Article III judges, *Cleavinger v. Saxner,* 474 U.S. 193, 201 (1985); *Tennessee Student Assistance Corp. v. Hood,* 541 U.S. 440, 457 (2004), and thus, there is nothing inappropriate about an ALJ's questioning of a witness to gauge the truthfulness of testimony. Indeed, in the non-adversarial setting of a social security hearing there is no one else to perform that indispensable task, and questioning witnesses is consistent with and demanded by the ALJ's basic obligation to develop a full and fair record and to scrupulously and conscientiously explore all relevant facts that bear on the claimant's capacity to work or his or her entitlement to benefits. *Cf. Heckler v. Campbell* 461 U.S. 458 (1983); *Johnson v. Barnhart,* 449 F.3d 804 (7th Cir.2006); *Madrid v. Barnhart,* 447 F.3d 788 (10th Cir.2006).

In this case, the ALJ cited four reasons in support of her assessment of the severity of Mr. Masek's symptoms. First, she concluded that the record did not contain

objective medical evidence of a string of past hospitalizations and suicide attempts; rather, there is only one recorded episode of decompensation and the rest of the evidence is only by Mr. Masek's self-report. (R. 37). Since the presence of objective indicators makes a claim more plausible, "their absence makes it less so." *Parker*, 2010 WL 851412, at *2.

While the ALJ did not exclude the possibility that Mr. Masek was telling the truth, she contrasts his testimony with Dr. Zarif's evaluation which suggests that even if Mr. Masek did repeatedly try to kill himself, he was less likely to do so if he remained on medication. (R. 40). Specifically, Dr. Zarif noted that Mr. Masek reported that he had periods of doing well, especially when he had a job and a place to stay. (R. 40). On discharge Dr. Zarif wrote that Mr. Masek "does well with structure, support, and employment, sobriety and constant encouragement to self empowerment." (R. 40).

Second, the ALJ went on to explain why she believed Mr. Masek exaggerated his claim of a learning disability as a consideration for adult disability. (R. 39). The record contained evidence that Mr. Masek was "specific learning disabled" in elementary school but does not go on to show that he continued to receive special education services in high school, contrary to Mr. Masek's testimony. (R. 39, 212, 262-64). While the ALJ did not completely dismiss the possibility that Mr. Masek may have continued to receive such services, she weighed his testimony in light of all the evidence. (R. 264). The opinion specifically addressed the fact that Mr. Masek's school report stated that he graduated with a standard high school diploma and average grades. (R. 39). Although Mr. Masek emphasized that he had a speech impairment in elementary school, the ALJ noted that during the two hour hearing Mr. Masek's speech was normal and clearly understood. (R. 39). She also noted that he had special job training in electronics. (R. 39).

42

Third, the ALJ considered Mr. Masek's testimony regarding his work history. (R. 40). Mr. Masek emphasized that he stopped going to various jobs between 2000 and 2004 as a result of his depression. (R. 40). Yet the ALJ noted that Mr. Masek's disability report showed that, in October 2004, Mr. Masek stopped going to work because he was laid off. (R. 40). Furthermore, Mr. Masek stated he could not work because he was afraid to work; he talked about how he would lose jobs quickly and could not hold a job. (R. 40). The ALJ balanced this statement with Mr. Masek's testimony that he had chosen to not look for a job since leaving the hospital in 2004 because he was advised not to seek a job while the disability case was pending. (R. 40).

The ALJ gave an appropriate amount of weight to Mr. Masek's daily activities, in accordance with the requirements set forth in 20 C.F.R. 404.1529(c)(3)(i). This case is distinguishable from *Bauer* which condemned the ALJ for focusing too closely on the plaintiff's activities of daily living in holding that plaintiff's bipolar disorder was not disabling. 532 F.3d at 608. Unlike this case, the ALJ in *Bauer* discounted well-supported evidence by two treating physicians that plaintiff's bipolar disorder prevented her from working, and disregarded uncontradicted evidence that the plaintiff was dependent on her son to complete many daily tasks including doing the dishes, laundry, grocery shopping, and cooking.

Here, the ALJ did not select and discuss only the evidence that favored her conclusion. *See Herron*, 19 F.3d at 333. The ALJ also addressed evidence that Mr. Masek had been incarcerated three times, used alcohol to self-medicate for his depression, and gets depressed and has suicidal ideation. (R. 40). The ALJ was not required to address every piece of evidence in the record in formulating her opinion. *Diaz*, 55 F.3d at 309. Instead, the ALJ met her duty of *minimally articulating* her

reasoning. *Zblewski v. Astrue*, 302 F.App'x 488, 493 (7th Cir. 2008).    The ALJ supported her reasons with record evidence sufficiently specific to make clear to any subsequent reviewer the weight given to Mr. Masek's statements and the reasons for that weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir.2003). On appeal, an ALJ's credibility findings should not be disturbed unless they are "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001). Because the ALJ was able to build a logical bridge between the evidence and the result, her credibility determination will stand. *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles*, 483 F.3d at 486.

### CONCLUSION

The ALJ's decision that Mr. Masek's depression was not of a disabling severity is supported by substantial evidence. Therefore, the plaintiff's motion for reversal or remand is DENIED [20], and the Commissioner's motion to affirm the decision [25] is GRANTED.

ENTERED:_____
                UNITED STATES MAGISTRATE JUDGE

DATE: 3/22/10